Mr. Moreno, do you want to reserve any time? Yes, Your Honor. Reserve any time? Good morning, Your Honor. Your Honors. Yes, Your Honor. Two or three minutes? Okay. Which one? Three minutes. Three minutes. We have a total of 10, right? Actually, you have a total of 20, but by all means, you don't have to use them. We actually are pleased when people don't use all their time if they don't need to. Especially on Friday. Indeed. I'll take five then, Your Honor, for rebuttal. Okay. And maybe, Your Honor, this case, obviously, you are all well aware of the facts. So I won't go over all the facts, but I think this case begs for a jury to look at that intersection. It begged it in 1965 and thereafter. It needed action to be done there. This is a county road. It started off as a dirt road. It was never engineered. That's an admission. But it was never looked at. As you all know, in dangerous condition cases, one of the primary obstacles at the beginning. Mr. Moreno, in this particular case, as I understand the facts, the county road ends about two feet before the actual track on each side. Is that right? To the easement. That's correct. Okay. And I also understand that the PUC controls how it should be engineered, both the road and any signals and that sort of thing. Is that correct? I don't think so, Your Honor. I think how the rails, the railroad company has control over its own signal devices. Right. Right. But, I mean, doesn't the railroad have to get a permit from the PUC or some other regulatory body before it can design the tracks, design and install safety devices? I believe so. However, that is a process and there's a case that the county, as the Court knows throughout the documents here, the county for 10 years had asked for the railroad company to put in, the PUC, to put in gates, the number nines, for 10 years. Do you fault them for that? Well, I fault them for this reason, is that they were on notice. And Mr. Neath is really, as the Court sees all our papers, Mr. Neath is really the key witness here. In his deposition, he admits that one of the, that in reviewing the accidents, as part of reviewing that intersection and all the accidents, and there's a serious question, and I think the defendants actually give the best evidence that there, and we don't have all the police reports, that there were at least seven, if not eight, and then a total of 11. But we only have three reports, which one includes our case here, the present one, 1965, 1997, and 2001. This is important to lay a foundation real quick, because in Mr. Neath's deposition, the managing engineer, I asked him on page Bates number 379, I asked him here in his deposition, on page 13 of his deposition, his answer is, there were eight accidents between 1965 and 1997. Question, correct. And do you know if there was ever an evaluation done after the 1997 accident, which would have included the seven before it, the accident in 1997? Right? Answer, right. So our seven before that, right? Answer, correct. Was there ever an evaluation done at Poplar in 1997, after the 1997 accident, to your knowledge? Answer. By, I don't know what you mean by evaluation. Well, answer, if I can finish. Sure. Question. If I may, I mean, you can present your case however you want, but in this particular case, we're not really dealing with a typical accident case here. We're dealing with a governmental entity. You've got the protections built into the California Government Code and a certain standard that has to be met, and that standard is under Government Code 835. You've got to show there's a dangerous condition, which means a condition of property that creates a substantial, as distinguished from a minor, trivial, or insignificant risk of injury. One such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used. And as I understand it, under 830.5a, an occurrence of an accident by itself is generally not evidence that public property is in a dangerous condition. So the fact that you're showing us this evidence is probably not that much more persuasive than the government's argument, the county's argument from the Federal Railroad Administration that shows that over 36 years, you had 6.5 million cars and 236,520 trains, and therefore you've got only four accidents since 1965 here. I'm not sure that this court is going to be swayed one way or the other by that, because we're dealing really with the guts of whether the trial court, based upon the legal standard that I just described, in evaluating the evidence before it and reviewing the standard, abused its discretion. Isn't that really what we're talking about here? Yes. I was just trying to answer. Yes, Your Honor, I agree. Well, I don't know you should say yes so quickly. This is a summary judgment, isn't it? No, no. Well, I'm saying that's what it's about. To a certain extent, I agreed with what he's saying in describing what we're doing here. But what I don't agree is with the trial court. And let me start. Let me back up again. I was answering your questions, what I was saying. And maybe that's why I was trying to go to knowledge. I was going to go that there's actual knowledge and constructive knowledge. And what I was trying to read there was that there was a problem at this intersection. What is the problem? What I'm getting at is that this thing is before us de novo, isn't it? Pardon? This question is before us de novo, isn't it? Correct. But I think a leading why we're here, though, this case, when it was evaluated, whether or not there's a dangerous condition, which you're going to do, is whether or not there's a dangerous condition. You need to look at the history of this intersection, and you need to look at what the judge at the district court did. One, he took a case, the Balding case, which he has in his order, which precedes comparative negligence in the State. And so he was dealing with plaintiff's contributory negligence. That is not the law. They mistake the law on Balding. It's a 1956 case, or 60, but anyway, precedes comparative negligence. So that case is right in the order. So the court and the court excluded, and they said, notwithstanding our experts regarding the issue that the court just read, whether or not under 835 of the government code we have a dangerous condition. Yes, that is the essence of this case. What is that dangerous condition? What is that essence? Let me get to that. Exactly. This is what this is about, and this is why these accidents are important. In this, if you look at our experts, and you can't ignore them, there's a case that I have here that says, a 1990 case, that you cannot ignore an expert's, and we have two excellent experts, and the court relied on Ruzak, their expert. So if you look at the expert, what is that dangerous condition? And factually, we have it also. Mr. Neath tells you when you get to that intersection, and you get to the limit line for the railroad north of the railroad track, you're going to arrive at that edge of the track, and you're going to have to look 135 degrees all the way to your back to see if a train is coming. Okay? Before you do that, you're approaching, and Mr. Ruzak lightly says in his declaration, however, the county admits, and they admit, that there's an orchard there that obscures up to 480 feet down the track. You don't have 1,500 feet to be able to look and see if a train is coming. You only have a limit once you get up to the track of 400 feet or so. I don't remember the record that way. I don't know that I read the record that way. When you get to the place where you stop, you can see the track for miles, can't you, all the way to the horizon? No, no. That's exactly the point. I mean, the track is here, and you're, what, five feet outside of it? No, Your Honor, with all respect, no, that's exactly the point. If I was in that van with seven people in it, and if I face the tracks, I can see the tracks in front of me. I can only see to my right, in a normal vision to my right, 90 degrees. I can see only 400 or so feet down the track. If you turn 135 to the right, you can see. That would be too abnormal. That's the issue for a jury to determine. In none of their cases, they say that language, and then they cite a case that says it's not unreasonable to turn your head. We submit to this Court, and having to turn behind you and look for a train that's coming 80 miles an hour to get up to that limit line, knowing that it's coming 80 miles an hour, with a skewed angle to your right to try to look through the passengers, which is foreseeable, to see if a train's coming, and at the same time, if you look at Douglas, you have State Highway 43 a few feet south of the tracks. That's the only stop sign that's why, if you look at the driver, what does the driver do? Everybody admits that. We have one witness that tells you there are no flashing lights at that gate, those lights, number 8. Okay, but that has nothing to do with the county, does it? If there's no flashing light, that means the railroad had a defective signal, doesn't it? That's the case that says that if there are lights, if there are some type of warning lights, then the driver, it's not unreasonable for the driver to depend that they would be functioning. Counsel, you've sued the county. Yes. The county has the road, not the railroad, right? Correct. So what we're really talking about here is whether the county had created a dangerous condition by the way the road approached the railroad, right? Approached the tracks. You're looking at the road, but the law is an adjacent property. If an adjacent property is in a dangerous condition, if you look at the totality of the circumstances, and I beg this Court to give me a chance, give this case a chance to look and see what I'm trying to say. It's in these documents, in these two experts. It's excellent what's presented about what the problem is. This driver proceeded with due caution. He didn't look, did he? Pardon? Did he look? Well, he's dead, number one. I understand that. We have to raise the inferences. This Court is duty-bound to raise the inference that for some reason he stops north at the living line at the track. What's the inference of that? That he stopped and he was driving with due care. He stops and then the witness – Is there any evidence in the record that the gentleman who's now deceased was driving with due care? Yes. Amanda Barton, the witness that's in the record, says that she sees the van proceed slowly to a stop and then inch from the north of the track across the tracks very slowly, because he's going to have to stop right in front, right across the tracks. He's going to have to stop for a major highway, 43. And she says she's there watching out of nowhere after he slowly proceeds from the stop, which you infer that he's driving reasonably because he made the stop. She says, I see no lights activated, warning of a train. This is a material difference of fact. We have a witness who says, I see no lights. Now, get to that. But that's the railroad. Let me, if I could. Right. But this is, I'll get to that. Counsel, when you say out of nowhere, I – That's what the witness says. From what I have seen, this was a flat land. There was no obstructions. You have to look at – The train was coming. Yes. If you look at the picture – Yes, we have that in the record. Defendant's exhibit, and you look at that picture, and you look down the track, and you see the orchard to the right that was chopped down after. If you look at the orchard and you look at the horizon, 4 o'clock on a December night, 4 o'clock in the evening, you look at the track. Once you turn 135 degrees to the right and you look at it, you lose what's in the background. And at this point, there are so many things the driver is called to do, but I have to kind of follow in order to tell you all the factors because I think this is the material factors, the questions of fact that a jury needs to decide. One, if the lights aren't working, if the railroad lights aren't working, then – and they're there, the quantum of care that a reasonable driver is required is not the same as if those lights – the railroad had not put those there. The county is on notice, and based on what I was trying to read here about the prior accidents, that they had an identical accident where it killed two other people before and a total of 11 accidents in that intersection. And the one below, because you have the same problem on the south, because they're all related. So when you get to that intersection and you rely on what the county knew could happen, is that those traffic, those railroad activated lights could not function. Then the person is in a trap. You're saying that the county knew that the railroad lights were not functioning? It's reasonably foreseeable. Let's say that's correct. What duty does the county have on someone else's property? The case of Carson, all the cases, the Shea case that they cite and we cite, you're responsible to warn, the county is responsible to warn of a dangerous condition on an adjacent property that affects their intersection, their property. That is case law all the way through. The adjacent property is in a dangerous condition, and here we have a combined intersection. You can't say the county doesn't know it. It goes across the track from point north to point south. This is ludicrous. If you want to save your full time, you'd ask for five. I mean, you can continue on if you want. Let me just finish. Go ahead. I appreciate it. The problem here is you have to look at the totality of these facts that you're asking me right now, indicate that there's a question of fact, indicate that this case should go to the jury, because you have to look at what Amanda Martin said. You have to look at why you have to turn to the 135. You look at the case law, and it says that a reasonable driver does not have to do something abnormally, that the quantum of care is not the same when their lights are not working. It's foreseeable that they may not be working, and then you're caught in a trap, because you cannot see an 80-mile-an-hour train until it's on you when you're proceeding across the tracks at the stop sign a few feet south. How do you distinguish the case of Chowdhury v. City of Los Angeles, which I understand to read that the county is not charged with foreseeing that the driver would not look before crossing? You don't have that evidence here. You have to give the plaintiffs, this is exactly what we're talking about, the inference that you have to, this court is duty-bound to do and the district court had to do, was that for some reason this driver, who is no longer here, and we have a witness that says he stops and then proceeds very slow. The inference is that he didn't see, and the lights aren't actuated, he didn't see a train. There's no evidence. They tried to throw in and smear the record that he's got alcohol on him, and that was ridiculous. So if you look at the totality and say, why did this driver move out in front of an 80-mile-an-hour train after he makes a stop and proceeds? You have to look at this intercession. You have to look at what Douglas said, and you have to look at what Crowman says. Two experts, and in light of those two experts, this raises a material fact. I'll say whatever time I have. Okay. We'll now hear from the county. Ms. Thurston, right? Yes, Your Honor. Good morning, Your Honor. Good morning. As the court pointed out, this is a heavily busy road. It's been used for decades. Over that time, the county has become aware of eight accidents. Of those eight, four, three or four had to do with vehicles stalled on the track. One became wedged. None of those can have anything to do with the condition of the road. It was unfortunate timing. Another one, a cottonseed driver failed to pull his trailer completely off the tracks. Again, that has nothing to do with the condition of the road. In fact, if you look at the substance of these police reports, which the plaintiff's experts never did, apparently, because they make no commonness to the substance, not one of them concluded that a condition of the road contributed to these accidents. Counsel, let me ask you, when you approach a railroad crossing, certainly your visibility at the time that you're at the line, the limit, is important. Isn't the approach to the railroad crossing important as well for a driver, for a reasonably cautious or prudent driver? It is. And that's why there are standards as to what the county is supposed to do to notice them that they're approaching a crossing, which the county did here. There seems to be no dispute as to the appropriate pavement markings and signs. And, in fact, as Mr. Moreto has pointed out emphatically, this driver had to have been aware of the crossing because he stopped there. There is no reason to stop at a crossing absent at least knowledge of the crossing and as Mr. Douglas concluded, in fact, that the railroad lights were flashing. I know that there is a warning, one or two maybe, before you get to the tracks, I gather. A warning sign. Is there a stop sign at the ‑‑ there was some reference. No. In fact, the law prohibits a stop sign at a crossing because a stop sign is permissive. Okay. So that's just a standard stop sign, basically. There's actually a law, you know, the Streets and Highways Code prohibits it, and that's found in RUSAC's declaration because that was an issue early on in this case, but the law would prohibit that. So what has to happen instead is when you approach a crossing and there's a flashing red light or other indication of a train present, you have to stop and continue to stop until it's safe to proceed. In this case, I do agree that the approach here is important. And there are two signs, there were two pavement markings, there's a change in the striping on the road to tell you that you are approaching an area where you can't change lanes, you're approaching a railroad crossing. Now, as the aerial photo shows, this is an area that is heavily agricultural, and in this case it requires, then, the approaches from about 500 feet out to have the surrounding agriculture areas go at an angle so that you, as you're approaching the intersection or the crossing, you have a greater view. But in this case, you have a view here once you hit the limit line, as Mr. Aguilar did, and stop, that the mate team engineer described as unrestricted, that you could see as far as the eye could see, and that was persuasive to the trial court. Judge Coyle found in particular that despite the expert's attempts to create an issue of material fact that they did not, that the pictorial evidence was so convincing in that regard. And that was, those were pictures taken in connection with the investigation of the current accident. Can you help me, Ms. Thurston, with this issue? Somewhere in the record, I kind of remembered a requirement on the part of the county before the road was designed to interplay with the PUC about how the road was to interface with the railroad. Is that correct? Yes, Your Honor. There was a PUC agreement issue that's found in Mr. Neath's deposition that told the county not only where the county's road would cross over, but the grade that it would cross. So basically, in terms of our evaluating whether there's a dangerous condition, we really have to consider the fact that the county didn't just design this road willy-nilly. It consulted with experts at the PUC and was told how the road was supposed to work. That's correct. That is the state of the evidence from the county's traffic engineer. Would that apply to the angle at which the road approached the track, or is it just the way the grade works when you're getting off? It applies to the point of crossing as well as the grade. Now, whether the county could have created some sort of an S-curve or something else to do that, possibly. But the county's obligation here is not to, the county's duty is satisfied if we warn. And I think it's been shown here pretty emphatically. We did warn. We said to everyone, there is a railroad crossing. We can't tell you if there's a train there. That is the obligation of the railroad, because they know if there's a train there. We do not. Is there a case or a statute that says just what you said, that the county's duty is satisfied if it warns? Yes, Your Honor. Which one is that? Government Code Section, I think, 830, Your Honor, sub B. That's the one I was referring to earlier? You were referring, I believe, to 835. Oh, I'm sorry. Okay. 830 sub B says that the county has an obligation to protect against harm. Now, one way to do that is to repair or to remedy, but the end of that subdivision is or warn of the dangerous condition. The other thing that is interesting to note, too, is the council has argued that it's reasonably foreseeable that the train's devices will fail. And yet, again, that is not the test for the county. The county doesn't, it doesn't have to be reasonably foreseeable. We have to have actual or constructive notice. There is no evidence that we had actual notice that these crossings would fail. In fact, the engineers driving the trains, who had done it thousands of times, said that they were never, had never been apprised that those crossing lights had failed. But instead, Government Code Section 835.2 says, constructive notice means it has to have been there for a certain period of time, and we have to be able to know the danger. Surely, if we had known that day, maybe earlier in the day that the crossing devices were failing or had failed, we would have an obligation to do something. But there is no evidence that that was the case. Instead, if it had failed, and yet the CHP officer saw them operating afterward when other trains came through, but if it failed for this particular accident, it was a temporary situation of which the county had no knowledge. So the fact that they could fail is not the test. Finally, as to the issue as to the experts' testimony, I agree. The court did find that it would not rely upon the experts. And the court is entitled to disregard because the law requires the court itself to first evaluate and not to necessarily, I mean, there's a case that says the fact that you can find an expert who will say there's a dangerous condition is not sufficient. But instead, the court must first look to see, as laypeople, can we determine if it's there? Do we need it? Well, the court's not obligated to let an expert supplant its legal judgment, right? Absolutely. The expert comes in, testifies as to some non-legal issue, but it's not going to supplant the court. Exactly, Your Honor, especially in these types of cases. But particularly in this case where the experts were opining as to the condition of the law, in fact saying that the county, what you should have done was installed crossing gates, and if you had done this or something else, but the state of the law is not that. And in particular as to the crossing gates, yes, the county had been asking for those gates since 1987, as it did for every crossing in the county. And the PUC did not approve them. The expert opines, for example, in that situation that had we been willing to pay for the entirety of those installation of gates, then we would have received a PUC approval. There's just no evidence to support that. But even if we did, and even if we could go out and buy that equipment, we don't have the authority according to the general orders to install it on railroad property. So the experts in this case not only tried to supplant factual evidence, but also the court's obligation to examine the law. And with those comments, I will submit. I gather the complaints about the orchard are that as you're driving along, you may not be able to view the whole track. That's true, much like when you're driving in the city and there are buildings. And at what point, at the point where you stop for the stop sign, my understanding is that then if you turn your head far enough, you have an unobstructed view of the track. Is that correct? Well, there's no stop sign. But, yeah, at the limit line in front of the crossing, that is true. I think the color photo is easier to see than the supplemental excerpt at page six. The photograph taken by the CHP officer the next day shows that you can see as good as your eyesight is up to the horizon. Thank you very much. Do you want to do your rebuttal, Mr. Moreno? I beg your indulgence here. I beg you to look, and I'll just try to highlight, to look at what Neith says, what I was beginning to read about why they looked at the PUC to put in the gates, the crossing gates, because of these accidents, and they didn't. The county has an obligation, and the case law is there. They can't idly sit by and watch the dangerous condition on their intersection. Do you agree with what your opposing counsel indicated, that there is nothing in the record indicating that there had been constructive or actual notice of a defective signal at the intersection? Yes, on that day. Okay, so they received no notice. Under the law, then, how can the county be responsible for, even if it did malfunction, how can it be responsible for something about which it received no notice? As Douglas says, our expert, one of our experts, as he says, whether or not those lights are activated, the law in California on much of it. But, counsel, as we just discussed here, the expert doesn't supplant the judge in determining what's wrong. No, I understand. I'm just highlighting something, Your Honor, that you can look at, is that you can, assuming they were working, either way, you stop and you can move if there's no train. If you see no train, we all know that you can go through flashing red lights. So if you assume that they were working or not working, and the inference is that he stops and then he proceeds slowly to go to the stop sign at 43, Highway 43, that skewed angle, that it's abnormal, you're blindsided from the back. You're being blindsided. That's why, Your Honors, look at, I beg you to look at the whole intersection, these pictures, Your Honor. If you look and get an understanding of what I'm talking about from these pictures and what the experts say, not because they're gospel truth, but because they explain the facts and the material facts. What Amanda Barton says, the train came out of nowhere. She was there. And the law says that adjacent property in a dangerous condition, if the railroad, forget the lights. Forget the lights are working or not working. Without those lights, you still have an intersection with a skewed angle that is beyond what is reasonable to expect a reasonable driver to have to encounter, to have to do those many things at that intersection creates that dangerous condition or at very minimum, I question fact. The law, one, she misstates, the defendant misstates. The PUC does not control what the county can do at intersection. They can shut it down. Neith said it in his deposition. He was there. They're P and K. So they can shut it down. There was no engineer plan. None. That road was never, that's a misstatement. I won't call it an untruth. There was never, it's unengineered. They put the railroad over a dirt road. Mr. Marino, we thank you for your argument. We appreciate the passion of your argument. I'm sure your client appreciates it as well. And we thank you both for your presentation. Thank you. The case of Aguilar et al. versus National Railroad Passenger Corporation et al. is submitted.
judges: Canby, Smith, Larson